## POU et al. v. SOUTH CAROLINA WARE-HOUSING CORPORATION.

District Court, E. D. South Carolina. June 23, 1928.

1. Subrogation ⟨⟩28—Surety cannot claim subrogation against insolvent debtor until payment of creditor.

A surety cannot claim subrogation against an insolvent debtor until creditor is paid in full.

2. Subrogation ⟨⟩28—Corporation guaranteeing obligations of another corporation cannot recover on claims after insolvency until payment of remaining guaranty obligation.

Corporation guaranteeing payment of income bonds and interest, together with preferred stock and dividends and operating expenses of another corporation, *held* not entitled to recover against assets of such corporation after insolvency until payment of all claims guaranteed, notwithstanding that guarantor was also insolvent and in the hands of receivers.

At Law. Action by James H. Pou and others, receivers of the Tobacco Growers' Co-operative Association, against the South Carolina Warehousing Corporation. Decree in accordance with opinion.

A. E. Strode, of Lynchburg, Va., and Arthur R. Young, of Charleston, S. C., for plaintiffs.

W. T. Joyner, of Raleigh, N. C., and J. D. O'Bryan, of Kingstree, S. C., for general creditors.

ERNEST F. COCHRAN, District Judge. A contest has arisen in the above-entitled cause between the plaintiffs, as receivers of the Tobacco Growers' Co-operative Association, and the other creditors of the South Carolina Warehousing Corporation. For convenience, the Tobacco Growers' Co-operative Association will hereafter be referred to as the Association, and the South Carolina Warehousing Corporation as the Corporation. The Tobacco Growers' Co-operative Association is a corporation organized under the laws of the state of North Carolina, and a receiver was appointed in a proceeding in another district to take charge of the assets, and the plaintiffs were appointed ancillary receivers for this district.

Upon the application of the plaintiffs, as receivers, in the above-entitled cause, which is an original proceeding in this district, a receiver was appointed to take charge of the assets of the Corporation, and he was directed by this court to receive proofs of all claims, and classify them and report them and the order of their priorities. The Association's claim is in the aggregate for $470,-224.81, with admitted credits of $272,610.-53, leaving a total balance of the principal of the claim at $197,614.29. Other claims have been presented, totaling $170,972.02. The receiver's report recommends that the Association's claims be postponed until all other claims are paid in full.

The parties have entered into a stipulation setting forth all of the facts, and have presented to this court the question as to whether the receiver's report and recommendation should be adopted, and the Association's claim postponed to that of all other creditors, or whether the Association's claim should share ratably with them. It is conceded that the assets of the Corporation will not pay all claims in full. The *amount* of the Association's claims is not conceded but, for the purposes of the decision of the question now presented, it has been stipulated that it may be assumed that the Association has claims of the nature set forth in the stipulation, and, if it should be held that such claims are entitled to share in the assets of the Corporation, the exact amount of the claims is left open for future determination, by reference or otherwise, as the court may decide.

It will not be necessary to set forth all of the facts in detail as contained in the stipulation. For a proper consideration and decision of the present question, it is sufficient to say that the facts are substantially as follows:

The Association was organized as a North Carolina nonprofit corporation under an enabling act of the state of North Carolina (Chapter 87, Public Laws 1921), and is domesticated in South Carolina and Virginia, which had similar statutes. The Association was organized to market tobacco co-operatively for its members resident in these three states. It faced two vital needs: First, it needed numerous tobacco warehouses on valuable real estate, in which the tobacco of its members might be received and handled; second, it was necessary that the receiving agency be a corporation distinct and separate from the Association, in order that, upon delivery of the tobacco to the receiving Corporation by the members of the Association, the receiving Corporation might issue a warehouse receipt to the Association, which could be negotiated by the Association, and used by the Association as collateral for loans.

A negotiable warehouse receipt could not be issued to the Association by itself, and it was necessary that the issuing corporation be a separate entity. The scheme of the organization of the Association therefore

provided for separate and distinct warehousing corporations, to be created under a plan by which the capital of such warehousing corporations would be ultimately contributed and paid in by growers resident in the warehouse district for which the corporation was formed. Pursuant to this plan, the territory covered by the Association in these three states was divided into five warehouse districts, and a separate corporation organized in each district. In South Carolina, the corporation was organized as the South Carolina Warehousing Corporation, under the laws of this state. While the membership of the Association is general over the three states, the common stock subscribers of the Corporation are limited to tobacco growers resident in South Carolina.

In order to effectively handle tobacco products of the members of the Association and carry out the plan, several written contracts were entered into, which are set forth in the stipulation. The details of these contracts need not be stated. It is sufficient to say that under these contracts the Corporation was to issue income bonds bearing interest payable in installments, and also preferred stock carrying fixed dividends and to be retired in installments. The Corporation was also to acquire warehouses and real estate therefor, and to receive and handle the tobacco and incur what are called operating expenses. The Association was to guarantee the income bonds and interest, the preferred stock and dividends, and also the operating expenses. Under the terms of the several agreements, but more especially by what has been denominated the "cross-contract" between the Association and the Corporation, the Association was to be indemnified and reimbursed for its expenditures in those respects.

Pursuant to these agreements, the Corporation not only issued preferred capital stock, with dividends, to be retired in installments, and its income bonds, with interest (also to be retired in installments), but also acquired warehouses and real estate and incurred large operating expenses. A part of the income bonds and interest, and also part of the preferred capital stock, fell due and were paid by the Association, and these payments constitute a part of the claims it has presented. The Association also paid large sums to the corporation for operating expenses, and these sums likewise constitute a part of its claims. It thus appears from the stipulation of facts that the Association guaranteed all of the obligations of the Corporation, that it has paid part of the claims

so guaranteed and failed to pay part, that the part which it has failed to pay in accordance with its guaranty are the claims now presented to the receiver, and that no other claims than those guaranteed have been incurred by the Corporation or have been presented to the receiver.

The holders of the claims thus guaranteed contend (and the receiver has recommended in their favor) that the Association should not be allowed in equity to present its claims in competition with them, inasmuch as their claims are guaranteed by the Association. The Association contends that it should be allowed to present its claims and share ratably in the estate, and that the guaranteed claims should present their claims for deficiency against the receivers of the Association, in the receivership proceedings against the Association, and share on such deficiency in the assets held under that receivership.

[1] It is the established rule that a surety may not claim subrogation against an insolvent debtor until the creditor is paid in full. U. S. v. Nat. Surety Co., 254 U. S. 73, 76, 41 S. Ct. 29, 65 L. Ed. 143; Jenkins v. Nat. Surety Co., 48 S. Ct. 445, 72 L. Ed. ——, decided by the Supreme Court of the United States, May 14, 1928; Peoples v. Peoples Bros. (D. C.) 254 F. 489; U. S. Fidelity & Guaranty Co. v. Union Bank (C. C. A.) 228 F. 448.

In this circuit it has been held that a surety on a bond indemnifying the obligee against loss for all money deposited in bank cannot be subrogated to the right of the obligee against the defaulting bank, though paying the penalty of the bond to the obligee, where the obligee's indebtedness was not satisfied in full. In that case a surety company was surety for a bank on a depository bond for $50,000. The amount of the deposit was $89,579.14. The bank, by its contract with the surety company, agreed to indemnify the surety company. The surety company paid its liability under the bond, to wit, $50,000. It then sought to present a claim for $50,000 and share along with the depositor in the estate. The court held that this could not be done. Maryland Casualty Co. v. Fouts (C. C. A. 4th) 11 F.(2d) 71, 46 A. L. R. 852.

In Jenkins v. Nat. Surety Co., decided by the Supreme Court of the United States on May 14, 1928, a surety company undertook to become surety for the deposit of a county treasurer in a bank, and took from the bank an indemnity agreement, and paid the full amount of its liability under the bond,

which, however, was less than the amount of the deposit, and then sought to prove the amount it had paid, as a claim against the insolvent estate in competition with the deficiency due the depositor, and the court held that, although the right claimed was not from subrogation, but upon the independent agreement with the bank for indemnity, nevertheless the effect was to reduce the final amount coming to the depositor, which it had agreed to become surety for, and in equity should not be allowed. In that case it was held that the established rule was that a surety could not claim subrogation against an insolvent debtor until the creditor is paid in full, and this equitable principle could not be affected by the expedient of taking a separate agreement from the debtor, and thereby enabling the surety to deprive the creditor of the benefit of the security he had demanded.

[2] I think these decisions are controlling here. It is true that those were cases of suretyship and the present is a case of a guaranty, and there are legal distinctions between a contract of suretyship and a guaranty; but those distinctions do not affect the present question. Every reason which can be advanced why a court of equity should not permit a surety to compete with, or interfere with the rights of, the assured, applies with equal, if not greater, force to the case of a guaranty. Here we have a guarantor that has partially performed its guaranty. The assets will not pay the guaranteed obligations in full. The guarantor proposes to take the amount of its partial performance and under its indemnity contract present the same as a claim against the assets of the Corporation, and thereby reduce the claims of the remaining guaranteed obligations, so that they will not receive their claims in full. I do not think that this can be permitted.

The learned and able counsel for the Association have argued that the Association and Corporation have been closely related, and that, the Association being also insolvent and in the hands of receivers, the rights and equities of the other creditors of the Association should be considered, and equity done them by allowing the Association to present its claim as suggested. But I cannot accede to this view. The Association and the Corporation are distinct legal entities. The creditors of the Association can claim only through the Association. Whatever equities or rights they may have are bound up in the Association, and can be asserted only through it as a legal entity, and that legal entity is bound by its obligation of guarantyship. And the receivers of the Association, of course, can claim no more than the Association could have claimed.

It has also been suggested that this court has held in this proceeding that the preferred stockholders are not creditors, and has thereby fixed their status, and that there has been no appeal from this decision, and that therefore the rule as between them and the Association would not apply. This court held in effect that, as between the income bondholders and other creditors of the Corporation, the preferred stockholders were stockholders with preference over common stock, and not creditors, and therefore they should be postponed to the bondholders and other creditors. But, so far as the present question is concerned, the fact that the preferred stockholders are postponed to the bondholders and other creditors, and are merely entitled to a preference as against the common stock, can make no difference in the question now presented as between the Association and the preferred stockholders. What is due the preferred stockholders by the Corporation is a liability of the Corporation, and that liability has been guaranteed by the Association, and, no matter whether it is called a debt, obligation, or liability, or whether the preferred stockholders are called stockholders, instead of creditors, can make no difference. The liability is there, in favor of the preferred stockholders. The Association has guaranteed that liability, and it cannot in equity be allowed to compete with the preferred stockholders until their claims have been paid in full.

For these reasons, the report and recommendation of the receiver must be adopted and confirmed, and all claims of the Association must be paid only after the payment of all the other obligations of the Corporation have been satisfied in full. Let the attorneys for the general creditors or the receiver prepare a decree in accordance with this opinion, serving a copy thereof upon the attorneys for the plaintiffs, and submit the same to the court for signature upon four days' notice.